STATE, JULIA DE CAMP ET AL., PROSECUTORS, v. THE HIBERNIA UNDERGROUND RAILROAD COMPANY.

1. Corporations organized under the supplement of March 12th, 1879, to the General Railroad act, (*Pamph. L.* 1879, *p.* 166,) are corporations created for public uses, although companies organized under that supplement are organized only for the transportation of minerals and of materials, implements and machinery used in the sinking and working of mines, and the tolls authorized to be charged are tolls for such transportation; and the legislature may grant to such corporations the power to take lands by condemnation under the right of eminent domain.

2. A railroad company having by its charter power to condemn lands, being in the use of lands for railroad purposes under a lease for an unexpired term from the owner of the fee, may take the same premises by condemnation, for the leasehold estate may be so limited in continuance and qualified in its character as not to subserve the needs of the company in the scheme of improvement authorized by its charter.

3. A company having powers of condemnation must take that which the legislature empowers it to take. It cannot carve out such an interest in, or incident of, property authorized to be taken as will suit its convenience, and condemn that. It must take what the legislature authorized it to take, and in the state and condition prescribed by the legislative will.

4. Section 12 of the General Railroad act, (*Rev., p.* 928,) empowers any company incorporated under the act to take by condemnation lands or materials required for the use of such company in the construction of its road, and provides that the commissioners' report shall be plenary evidence of the right of the company "to have, hold, use, occupy, possess and enjoy the said lands or materials." *Held*—

1. That a company taking property for its road-bed, by condemnation under the statute, must take for its possession and use such an estate or interest therein as, in a legal sense, is comprehended in the term "land," whereof the unqualified use and possession, for the legitimate purposes of the company, will be transferred by the condemnation proceedings; and

2. That a petition for the appointment of commissioners, describing the lands and stating that it is not intended to acquire any right or easement of support for the track or road-bed of the railroad by the ores lying beneath, and that the owner shall be at liberty, after reasonable notice, to remove the ores, notwithstanding the removal may weaken or destroy the road-bed, and that if the support of the road-bed be destroyed or materially weakened by the removal of ores, then the

company shall have the right to support said road-bed by timbers placed across the tunnel or by other means, or to make an excavation in the hanging walls of the vein of the ore for the purpose of providing a road-bed, is not in compliance with the statute ; that the statute affords no warrant for the acquisition of such a qualified right in lands or the imposition of burdens and duties upon owners in connection therewith, by process of condemnation.

On *certiorari.*

This writ of *certiorari* brings up an order made by a justice of the Supreme Court, appointing commissioners to condemn lands of the prosecutors for railroad purposes, on the application of the Hibernia Underground Railroad Company.    The company was organized August 22d, 1879, by articles of association filed pursuant to an act of the legislature entitled "A further supplement to an act entitled 'An act to authorize the formation of railroad companies and regulate the same,'" which supplement was approved March 12th, 1879. *Pamph. L., p.* 166.

The original act, to which the act of 1879 is a supplement, is known as the General Railroad act.   It provides for the organization of companies for constructing and operating railroads, and specifies the powers and franchises, and the duties and obligations of such corporations.   Section 12 provides the proceedings for the condemnation of lands or materials required for the use of such companies.   *Rev., p.* 925.

The supplement of 1879 provides for the organization of companies " for the purpose of locating, constructing, maintaining and operating railroads to be located, in whole or in part, beneath the surface of the earth, and to be used for the transportation of minerals and of material, implements and machinery used or to be used in the sinking or working of mines, or for the purpose of purchasing, operating and maintaining any railroad already located and constructed for such purpose, in whole or in part beneath the surface of the earth ;" and that companies so formed " shall have all the powers and may exercise all the franchises conferred upon and which may

be exercised by corporations formed under the provisions of the act to which this is a supplement, and shall in like manner be subject to all the restrictions, limitations and regulations by the laws of this state imposed upon and applicable to such corporations."

The fourth section provides that any corporation or private person owning or operating such a railroad may charge at a specified rate for the transportation of freight.

The railroad proposed to be maintained and operated by the company, as appears by its articles of association, is about two-thirds of a mile in length, and is wholly under ground. It commences at the mouth of the conduit or tunnel of the Hibernia mines, and passes over six adjoining sections of the "Hibernia ore vein," belonging to as many different owners, and ends in the vein without any outlet upon the surface at that extremity.

Argued at November Term, 1884, before Justices DEPUE and SCUDDER.

For the prosecutors, *Alfred Mills* and *Cortlandt Parker.*

*Contra, Mahlon Pitney* and *H. C. Pitney.*

The opinion of the court was delivered by

DEPUE, J. The act of 1869, by its title, is made a supplement to the general railroad law, and corporations organized under it are companies of a cognate character with those provided in the original act. It is therefore subject to that rule of law that a supplement and the original act are parts of the same law, and will receive the same construction. *Hawthorne* v. *Hoboken*, 3 *Vroom* 172; *Stephens & Condit Tr. Co.* v. *C. R. R. Co.*, 4 *Vroom* 229. That companies organized under this act are corporations created for public purposes, and that the legislature may give to them the power to take property under the right of eminent domain, was in effect decided by the Court of Errors and Appeals in *Nat. Docks R. R. Co.* v. *C.*

*R. R. Co.*, 5 *Stew. Eq.* 755.    Companies organized under the
act of 1879 are organized only for the transportation of min-
erals and of materials, implements and machinery used in the
sinking and making of mines, and the tolls authorized to be
charged are the tolls for such transportation ; but a carrier of
freight is engaged in a public employment as much as a car-
rier of passengers.    The power of the legislature to create
canal companies for the transportation of freight only, or rail-
road companies to carry passengers only, and to endow such
corporations with the powers of condemnation, is undisputed,
and if the legislature may create corporations with such powers
in one of the departments of the business of common carriers,
it may in its discretion still further qualify its grant if the
business for which such corporations are created be in fact
within the category of public uses.

The railroad projected by this company has its northeast-
erly terminus under ground and on private property, without
any outlet in that direction.    Its southwesterly terminus is at
dumps which form a connection with the railroad of the Hi-
bernia Mine Railroad Company, a company incorporated in
1863, (*Pamph. L., p.* 339,) whose railroad is a surface railroad
connecting with the railroads of the Central and the Morris
and Essex Railroad Companies.    It is also true that the
number of persons who will be able to use this company's
railroad for transportation purposes is limited.    But the min-
ing vein into which the railroad is projected is one of the most
valuable and productive mining sections in this state, and its
importance in furnishing facilities for transportation is demon-
strated by the fact that upon the railroad now there, since its
construction in 1879, three hundred and fifty-five thousand
seven hundred and ninety-six tons of ore have been carried.
A highway may be laid out as a public road, though it be no
thoroughfare, and has at one end its terminus on private prop-
erty, (*State* v. *Bishop*, 10 *Vroom* 226,) and a private road (as
distinguished from a mere private right of way) is a public
use for which lands may be taken by condemnation, although
the road may be used by a limited part of the public only,

and the obligation to make and repair it is laid on individuals, interested, and they may erect swinging gates across it. *Perrine* v. *Farr*, 2 *Zab.* 356, 363; *Allen* v. *Stevens*, 5 *Dutcher* 509, 511.

These principles apply in this case. This enterprise does not lose the character of a public use because of the fact that the projected railroad is not a thoroughfare, and that its use may be limited by circumstances to a comparatively small part of the public. Every one of the public having occasion to send materials, implements or machinery for mining purposes into or to obtain ores from the several mining tracts adjacent to the location of this road, may use this railroad for that purpose, and of right may require the company to serve him in that respect; and that is the test which determines whether the use is public. Nor will any motive of personal gain which may have influenced the projectors in undertaking the work take from it its public character. As was said by Mr. Justice Dixon in the National Docks case, in speaking of railroads organized under the General Railroad act, "Whether the motive of the corporators is private convenience, and whether the actual use is likely to be general, are of no more importance than the like considerations in the laying out of what are called private roads. It is the right which characterizes the enterprise, and that is public."

A particular improvement palpably for private advantage only, will not become a public use because of the theoretical right of the public to use it. But where the franchise is in its nature a public franchise—as the transportation of freight is—and the object promoted is one that concerns the public interests—as the development of the mining resources of the state does—the improvement is essentially for public benefit and advantage, and if there be no restriction on the right of the public to use it, and no inability to use it except such as arises from circumstances, the court, in determining whether the improvement is such a public use as that the right of condemnation shall extend to it, will not scan closely the number of individuals immediately profited by it. Indeed, it would

not be possible to indicate the number of persons or define the area of the limits to which the benefits of such an improvement may extend.   If lands may be taken for private roads —as they may—on the score of public benefits, it would seem more than reasonable that the same right, on the same considerations, should be extended to improvements of the character of the one in question.

The railroad made the basis of these proceedings has already been constructed, and is in use as a private enterprise.   It was built by the Glendon Iron Company, who are the lessees of the prosecutors' mines, under covenants and agreements contained in the lease.   The lease is for a term of twenty years from March 1st, 1874, with a reservation of certain royalties as rent, and a right in the lessee to surrender after five years. No surrender of the lease has been made, and the Glendon company, by an indenture dated August 9th, 1879, granted and conveyed to the Hibernia Underground Railroad Company the railroad, road-bed and appendages.   That the premises are under lease, and that the company may have the rights of the lessee in the railroad to operate it for a term of years unexpired, is no legal bar to these proceedings.   A company having constructed its railroad, and being in the use of franchises for that purpose, under a lease from the owner of the fee, may take the same premises by condemnation; for the leasehold estate may be so limited in its continuance and qualified in its character as not to subserve the needs of the company in the scheme of improvement authorized by its charter.   *N. Y. & N. H. R. R. Co.* v. *Kip*, 46 *N. Y.* 546; *S. C.*, 67 *N. Y.* 227.   If there be any equitable ground for maintaining the leasehold estate and the covenants of the lease in their integrity as against this company, we have no concern with such rights at this time.   In this suit we look only upon the legal rights of the parties.

The act of 1879 does not furnish a method of conducting condemnations of property required for the construction of the railroads authorized by the act.   The only reference to that subject is in the third and fourth sections.   The third section

provides that when any corporation formed under the act shall "take legal proceedings to acquire the right of way for its proposed railroad" beneath the surface of the earth, such right of way shall not include the right to permanently use or occupy the surface of the earth immediately above such railroad, * * * but shall be confined to a mere right to tunnel and excavate the earth for its tracks, but may nevertheless acquire the surface or such parts thereof as may be necessary or proper for the operation of its railroad. The fourth section provides that where a railroad shall have been built under or through lands without acquiring the right to maintain the same from the owner of the fee simple, the corporation owning or operating said railroad may "take and prosecute all such legal proceedings" for acquiring the right to maintain and operate its railroad as it might take if such railroad had not as yet been built. As a matter of legislative intent, it is clear that the purpose was to confer upon corporations organized under the act of 1879 the powers of condemnation, and the use of the machinery for that purpose provided in the original act, which is a general law providing the legal proceedings to acquire rights of way for railroad purposes. This legislative intent acquires additional expression in the fact that the act of 1879 is a supplement to the General Railroad act, and, by express provision, corporations organized under it are endowed with all the franchises which may be exercised by corporations organized under the original act. Nor is that method of legislation prohibited by paragraph 4, section 7, article IV., of the amended constitution. An act of the legislature which is a complete and perfect act of legislation in itself, as this act is in its main purpose—the incorporation and organization of corporations for the objects mentioned—may provide for ancillary proceedings to accomplish the purposes expressed in the act, by a reference to general laws on the subject, without violating this constitutional provision. *People* v. *Banks,* 67 *N. Y.* 569; *Campbell* v. *Board of Pharmacy,* 16 *Vroom* 241.

The power to condemn lands for railroad purposes in the General Railroad act is conferred by section 12, which also

prescribes the method of conducting the proceedings, and the effect of the condemnation when effected. The act of 1869 has not changed the description of that which may be taken, except that it provides that where legal proceedings are taken to obtain a right of way beneath the surface of the earth, such right of way shall not include the right to permanently use or occupy the surface above.

In construing acts of the legislature granting powers of condemnation, two rules are universally recognized : first, that the company shall take that which the legislature empowers it to take, and in the state and condition prescribed by the legislature; and second, that all powers of this nature will be strictly construed—what is not expressly given is withheld. The company cannot carve out such an interest in, or incident of, property authorized to be taken as will suit its convenience, and condemn that. It must take what the legislature authorized it to take, and in the state and condition prescribed by the legislative will.

The section under which these proceedings were had authorizes the condemnation of land. The application for the appointment of commissioners is to describe the land required. The commissioners are to examine and appraise the land. On payment or tender of the amount awarded, the company is empowered to enter upon and take possession of the said lands, and the commissioners' report is plenary evidence of the company's right "to have, hold, use, occupy, possess and enjoy the said land;" and its possession within the location must necessarily be exclusive except where another public right, such as the crossing of a highway or another railroad, intervenes. *Pierce on Railroads* 159. Under this designation, as was said by the Chief Justice in *Taylor* v. *N. Y. & L. B. R. R. Co.*, 9 *Vroom* 28, 30, "the right to use for the specified purpose everything which, in the legal sense, is comprehended in the term 'land,' is transferred." In *Watson* v. *Acquackanonk Water Co.*, 7 *Vroom* 195, the company was incorporated as a water company. It had power to obtain by purchase the right to use, divert and appropriate any springs, streams or

ponds of water. It also had power to enter upon all lands or waters, and survey, search, excavate and bore for water, and locate reservoirs, * * * aqueducts, pipes, fountains, water-wheels, force-pumps and buildings, and all other neces-sary works and appendages thereto, with a power to condemn the lands required, and have assessed the value of the same and the damages which would accrue from erecting said works, in language of like import with that of the twelfth section of this act. The company proposed to locate its works upon its own premises, by which, without taking the bed of the stream or any part of Watson's lands, it would divert from him the waters of Weasel brook, and take and use the same in its reservoir, and commingle with and flow into the broo : the less pure water of the Dundee canal. This court held that an appointment of commissioners to assess the damages which Watson would sustain by the contemplated work was not warranted by the company's charter, and that under the charter lands must be taken in order to warrant any assessment of damages. This case is useful as illustrative of the strictness with which acts of this kind will be construed. The company did not need the possession or occupation of Watson's lands. All it needed was a limited and qualified right in the lands to abstract and pollute the waters flowing over them. This court held that such a right or interest in lands could not be acquired by condemnation, for the reason that the company's charter gave it power only to condemn lands.

The English judges have expressed the same views upon the construction of the Lands Clauses Consolidation and the Railways Clauses Consolidation acts. Both these acts authorize the taking of land for the purposes of the undertaking, (8 *Vic.*, c. 18, § 16 ; 8 *Vic.*, c. 20, § 6,) and each has an interpretation clause " that lands shall extend to messuages, lands, tenements and hereditaments of any tenure." In a case in which a railway company proposed to cross the plaintiff's property, not by taking any portion of the soil, but by putting buttresses on its own property and carrying its line over the plaintiff's premises by means of an arch, Lord Chancellor

Cranworth held that the company could not take this right under the statute, and that, notwithstanding the interpretation clause, the act did not authorize the company to take a mere right of way. *Pinchin* v. *London and Blackwall Railway Co.,* 5 *De Gex, M. & G.* 851. This construction was approved by Jessel, M. R., in *In re Dist. Met. R. R. Co.,* 13 *Ch. D.* 616 ; by Fry, J., in *Hill* v. *Midland R. R. Co.,* 21 *Ch. D.* 143 ; by Chitty, J., by Jessel, M. R., and by Cotton and Bowen, L. JJ., in *G. W. R. R. Co.* v. *S. & C. R. R. Co.,* 22 *Ch. D.* 685–709 ; by Lords Fitzgerald and Watson in the same case in *H. of L.,* 9 *App. Cas.* 792–803. In that case, in the Court of Appeals, Jessel, M. R., said : " That such a privilege of running trains over land is not land is clear. Is it, then, land within the meaning of the third section, which says that the word ' lands ' shall extend to messuages, lands, tenements and hereditaments of whatever tenure ?   In the absence of decision there might be a question whether the word ' hereditament ' would not include such a right. It is not a tenement, for I do not conceive that any kind of running power could be the subject of tenure, but the word ' hereditament ' might be held to apply to it. When, however, we consider the object of the statute, I think no one can doubt that the decisions are right which lay down that it never was intended to compel a land-owner to carve a new easement out of his land and sell it to the company against his will. The result, therefore, is that the word ' lands ' in the Lands Clauses act does not include any incorporeal easements except such as are attached to the lands which are the subject of purchase." In the House of Lords, Lord Bramwell expressed dissatisfaction with this construction, but his dissatisfaction arose from the word "hereditament," which he thought would include a right of way ; and it will be observed that the company in that case succeeded because its special act expressly conferred the right to take an easement. No English judge has intimated that, under the designation of land, an easement or right in, or use of lands, short of the estate comprised in the legal signification of lands, could be taken ; and the English courts have expressly decided that the word

" lands " in the sixth section of the Lands Clauses Consolidation act includes mines and minerals. *Smith* v. *G. W. R. R. Co.*, 3 *App. Cas.* 165; *Ewington* v. *Met. Dist. R. R. Co.*, 19 *Ch. D.* 559. Our statute completely removes the subject from the region of doubt. It not only gives the power to take under the designation of lands, but it prescribes that the condemnation, when consummated, shall be plenary evidence of the right of the company " to have, hold, use, occupy, possess and enjoy the said lands "—technical words of conveyance, wholly inapplicable to anything else than a corporeal hereditament—land, in its legal signification.

The cases in our own courts holding that one railroad company condemning lands already in use by another company, will acquire only a right of crossing and the use of the place of crossing in common with the other company, do not bear on this question. In such cases the legal effect of the condemnation is restricted to a right of way for a crossing, without the exclusive possession and use, not as a matter of choice with the condemning party, but as a legal consequence of the principle of law that the condemnation is inefficacious to destroy or impair the franchises of the other company. *State, Nat. R. R. Co., pros.,* v. *E. & A. R. R. Co.*, 7 *Vroom* 181; *N. J. S. R. R. Co.* v. *Long Branch Com'rs*, 10 *Vroom* 28.

I think it is clear that under the General Railroad act, where the condemnation is of lands not already impressed with corporate franchises, the condemnation must be of lands, in the legal sense of that term, whereof the exclusive possession and use for the purposes for which they are taken will be transferred, and that any lesser interest in lands than the unqualified use and possession for the legitimate purposes of the company cannot be obtained by condemnation; and corporations organized under the act of 1869 can only take that which, and in the manner which, the legislature has prescribed in the General Railroad act. Except in virtue of the special power granted by that act, such corporations have no power to take at all. They must take lands for their right of way with the qualifi-

cation that they need not take the right to permanently use or occupy the surface of the earth above their tunnels.

The petition on which this application was made states "that the following is a particular description and statement of the land required for the use of your petitioner in the operation of its said railroad, and of the rights and privileges required by your petitioner for the purposes aforesaid, and which your petitioner desires to acquire: The right to perpetually maintain and operate the Hibernia Underground railroad, as at present constructed and operated, being a railroad with a single track of the gauge or breadth of two feet and nine inches between the rails, and operated by steam locomotives and cars not exceeding six feet and six inches in breadth and eight feet in height, in, through and along that portion of the Hibernia tunnel which lies within the boundaries of a certain tract of land known as the 'De Camp mine lot' [annexing a map of the tunnel and of the location of the centre line of the railroad by courses and distances] ; also, the right to repair, renew and alter said railroad as occasion may require, including the right, for the purposes aforesaid, to enter upon and occupy so much of said tunnel as lies within four feet of said centre line on each side thereof; provided, however, that the tracks of said railroad are not to be laid upon or to occupy either of the two following-described portions of said tunnel, to wit:" (followed by a particular description of the excepted parcels.)

Then follows the statement that " these proceedings are not intended to acquire any right or easement of support for the tracks or road-bed of said railroad by the ores lying beneath said tracks and road-bed, but the present and future owners of said De Camp mine lot are to be at liberty, after reasonable notice to said Hibernia Underground Railroad Company or their successors or assigns, to mine and remove all or any part of the ores lying beneath said road-bed, notwithstanding the removal thereof may weaken or destroy the support of said road-bed ; and further, in case at any time the support of said road-bed shall happen to be destroyed or materially weakened by reason of the removal, in whole or in part, of the ores lying

De Camp v. Hibernia Railroad Co.

beneath the same, then and in such case the said Hibernia Underground Railroad Company and its successors and assigns are to have the right to support said road-bed by timbering placed across said tunnel or by other means, or to make an excavation in the southeasterly or hanging wall of said vein, for the purpose of providing a road-bed for said railroad, such excavation not to exceed the breadth of eight feet measured from the face of said hanging wall, and the height of eight feet, and to extend along said hanging wall across said lot of land at the same level as the present floor of said tunnel."

These proceedings do not comply with the statute. In the first place, the company does not propose to take the lands described, in the legal sense of that term, nor the exclusive occupation and use of such lands. It proposes by this condemnation to acquire an interest in the lands and the possession and use of them in common with the owners, and to impose upon the owners obligations and duties in connection therewith—the obligation to give reasonable notice before they remove the ores from beneath the road-bed, and the duty, which the law will imply, that they shall exercise their right to remove ores with due regard to the company's rights in the premises. The statute affords no warrant for the acquisition of such a qualified right in lands, or the imposition of burdens and duties upon owners in connection therewith, by process of condemnation. The statute only authorizes the taking of lands, and the occupation and use of lands, in the state and condition of lands in the legal sense of that term.

In the next place, the location on which the company proposes to maintain its track is uncertain. In one contingency it is to be upon its present site; in another contingency, within an excavation to be made in the southeasterly or hanging wall of the vein.

For these reasons the order of appointment should be set aside, with costs.